# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA,

**REPORT AND RECOMMENDATION
12-CR-6117**

v.

**CHRISTINE WRIGHT-DARRISAW**

Defendant.

## Preliminary Statement

By text Order of Judge David G. Larimer, dated August 28, 2012, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A)-(B). (Docket # 25). On August 28, 2012, defendant Christine Wright-Darrisaw was charged in a two count Indictment, including counts of making a threat against the President, and making a false statement. See Indictment (Docket # 24). Currently before the Court are defendant's motions to suppress statements and to suppress information seized from her cellular telephone. (Docket # 28). The Government filed papers in opposition to defendant's motion. (Docket # 31). Pre-hearing memoranda were submitted by defendant and the Government. (Dockets ## 36, 37). A suppression hearing was held on January 29, 2013. The following is my Report and Recommendation as to the defendant's motions.

**Findings of Fact**

On March 3, 2012, United States Secret Service Special Agent Joel Blackerby was involved in an investigation relative to threats allegedly made by the defendant, Christine Wright-Darrisaw, against the President of the United States. See January 29, 2013 Suppression Hearing Transcript (hereinafter "1/29/13 Tr.") (Docket # 39) at pp. 4-5. Agent Blackerby had been searching for defendant for over a week, and his "investigation revealed she had class at [Monroe County Community College]." Id. at p. 5. Agent Blackerby determined that his "best chance" of locating defendant to speak with her about the alleged incident would be to find her at Monroe County Community College ("MCC"). Id. Thus, on March 3, 2012, as part of his investigation, Agent Blackerby - wearing khaki pants, a polo shirt and a light blue "windbreaker" jacket - drove to MCC to conduct an interview with defendant Wright-Darrisaw. Id. at pp. 5-6. Prior to driving to MCC, Agent Blackerby contacted the MCC security office to advise it that he would be visiting the campus that day. Id. at p. 5. Upon his arrival at MCC, Agent Blackerby "went directly to the security office and met with [MCC security officer] Mr. Hull." Id. at p. 6. Blackerby spoke with Hull upon his arrival and requested that MCC security accompany him during his interview with defendant. Id. at p. 32.

Hull and another MCC security officer accompanied Blackerby to the classroom where defendant Wright-Darrisaw was taking her class.

Id. at p. 7. Blackerby was carrying a firearm, but it was not openly displayed. Id. at p. 6. The MCC security officers were not carrying firearms. Id. Hull knocked on the door and advised the professor that he needed to speak with defendant Wright-Darrisaw. Id. at p. 7. Wright-Darrisaw agreed to speak with the officers out in the hallway. Id. Once defendant was in the hallway, Hull explained to her that Agent Blackerby needed to speak with her, and Agent Blackerby identified himself and "gave her a brief description of the scope of the investigation, why I needed to speak with her." Id. at pp. 8-9. Specifically, Agent Blackerby told defendant that he is "a special agent with the Secret Service and [was] currently investigating a threat that was made to the President." Id. at p. 9. Blackerby, Hull and Wright-Darrisaw then walked about 30-40 feet down the hall to a bench to continue their conversation. The other MCC security officer remained at the other end of the hall and did not participate in the questioning.

During his conversation with defendant, Agent Blackerby sat in a chair facing defendant while she sat across the bench. Id. at p. 17. Security Officer Hull was behind and to the left of Blackerby during the interview. Id. Agent Blackerby began asking defendant about the telephone call at issue and asked her if she had made the call. Id. at p. 12. Defendant "willingly said that the phone number for the White House is in her cell phone contacts." Id. Blackerby asked if she would show him the White House contact in

3

her cell phone, and defendant took her cell phone out of her purse, "opened it up, pulled [the White House telephone number] up and turned [the phone] and showed it to me." Id. at p. 13. Blackerby recognized the number in defendant's cell phone as being the number for the White House, as "[i]t was identical to the [number] that I had in my notes that I had been given." Id. at p. 29. Blackerby looked at defendant's cell phone for "[a] couple seconds." Id. Agent Blackerby never took the cell phone from defendant, and never touched her phone or "scrolled" through it in any way. Id. at p. 13. Blackerby asked defendant "about call logs; the call history, incoming and outgoing calls in her phone," and asked if he could see the call logs on her phone. Id. Defendant Wright-Darrisaw said "no," refused to show Blackerby her call logs or call history, shut her phone off and placed it back in her purse. Id. at p. 14. At that point, defendant's demeanor started to change, as she became "a little more agitated" and "[a] little more confrontational verbally." Id. At the start of the interview, defendant's demeanor had been "[v]ery polite, very open." Id.

During the interview, Agent Blackerby showed defendant two forms: first, a "consent form" known as a 1945 Standard Service Form ("SSF"); and second, a voluntary consent to search form. Id. at pp. 20-21. The 1945 SSF form is used by the Secret Service during protective investigations to allow the Secret Service "to view all psychiatric records pertaining to [defendant] in the

United States." Id. at p. 20. Defendant Wright-Darrisaw refused to sign the 1945 SSF form. Id. at p. 21. Agent Blackerby also asked defendant to sign the voluntary consent to search form so that he could search the vehicle that she had on the MCC campus that day. Id. Defendant Wright-Darrisaw refused to sign the consent to search form. Id. Upon being asked to sign the two forms, defendant became even more "agitated" and, at that point, Agent Blackerby decided to terminate the interview. Id. at p. 22. Agent Blackerby thanked defendant for speaking with him and told her "you're free to go back to class if you wish." Id.

The interview lasted approximately twenty minutes. Id. at p. 18. During the interview, defendant never asked to leave and the officers never told her that she had to stay or that she could not go back to her classroom. Id. at pp. 11-12, 18. Defendant never asked for an attorney. Id. at p. 18. Agent Blackerby never told defendant that she was under arrest or that she had to speak with him, never threatened her, never made any promises to her, and never showed or used any type of restraints, handcuffs or zip ties or attempted to physically block her or prevent her from moving. Id. at pp. 9, 11, 19-20. Defendant Wright-Darrisaw was never read her Miranda warnings. Id. at p. 26.

## Discussion

Wright-Darrisaw seeks to suppress (1) the statements she made

to law enforcement during the March 3, 2012 interview at MCC, and (2) information seized from her cellular telephone during the March 3, 2012 interview with law enforcement.

1. <u>Motion to Suppress Statements</u>: Wright-Darrisaw moves to suppress statements she made to law enforcement on March 3, 2012 on grounds that the statements were taken in violation of <u>Miranda</u> rights. <u>Id.</u> Law enforcement officers are required to give <u>Miranda</u> warnings before questioning a person who has been "taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966). The admissibility of Wright-Darrisaw's statements to Agent Blackerby depend on whether the defendant's right to warnings required by <u>Miranda</u> had attached.

"Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." <u>United States v. Mitchell</u>, 966 F.2d 92, 98 (2d Cir. 1992). Thus, even in the absence of an actual arrest, an individual shall be deemed to be in custody when "law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave." <u>United States v. Kirsh</u>, 54 F.3d 1062, 1067 (2d Cir. 1995)(citations omitted); <u>see</u> <u>United States v. Hall</u>, 421 F.2d 540, 545 (2d Cir. 1969)("[I]n the absence of actual arrest something must be said or done by the

authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so."). The test for custody is an objective one based on the totality of circumstances surrounding the particular encounter at issue. See Stansbury v. California, 511 U.S. 318, 323 (1994). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442 (1984).

The foregoing recapitulation of the legal standard notwithstanding, "courts will continue occasionally to have difficulty deciding exactly when a suspect has been taken into custody" or otherwise deprived of his freedom of movement in any significant way. Id. at 441.

> Courts have looked at various factors in making this determination. These include: whether a suspect is or is not told that she is free to leave, see Campaneria v. Reid, 891 F.2d 1014, 1021 n.1 (2d Cir. 1989); the location and atmosphere of the interrogation, see Oregon v. Mathiason, 429 U.S. 492, 494-95, 97 S.Ct. 711, 713-14 (1977); the language and tone used by the police, see United States v. Guarno, 819 F.2d 28, 31-32 (2d Cir. 1987); whether the suspect is searched, frisked, or patted down, see United States v. Wilson, 901 F. Supp. 172, 175 (S.D.N.Y. 1995); and the length of the interrogation, see Berkemer, 468 U.S. at 437-38.

Tankleff v. Senkowski, 135 F.3d 235, 244 (2d Cir. 1998). In United States v. Newton, the Second Circuit expanded on the proper test

for determining whether an individual is "in custody" for purposes of complying with Miranda. 369 F.3d 659 (2d Cir. 2004). The court in Newton adopted a two part analysis: (1) the court must determine "whether a reasonable person would have thought he was free to leave," (id. at 672); and, if not, (2) "whether his freedom of action has been curtailed to a degree associated with formal arrest" (id. at 671 (citations and internal quotation marks omitted)).

After careful review of totality of the circumstances surrounding the events of March 3, 2012, and after consideration of the various indicia of "custody," including, *inter alia*, the factors identified in Tankleff, I conclude that Wright-Darrisaw was not subjected to custodial interrogation because a reasonable person in the circumstances presented here would not have thought she was not free to leave. Thus Miranda warnings were not required.

Blackerby testified that he met defendant at the MCC campus where defendant was taking a class, and after introducing himself to defendant he explained that he was investigating a threat against the President that was made by a telephone call to the White House. Agent Blackerby asked defendant if she had made the telephone call at issue, and defendant immediately admitted to having the White House's telephone number in her cell phone contacts. There is no evidence of threats, coercion or

8

intimidation in Blackerby's brief encounter with Wright-Darrisaw. During their brief meeting, Blackerby never advised Wright-Darrisaw that she was under arrest or was going to be arrested, and Blackerby never did in fact arrest Wright-Darrisaw that day in connection with the responses she gave to his questions. Defendant was never searched, frisked or patted down by any of the officers. Blackerby's firearm was neither drawn nor visible. There is no evidence to suggest that defendant was told that she was not free to leave. There was no trickery or ruse used to induce any admissions. There is no evidence that Wright-Darrisaw felt she was compelled to answer any question posed by Blackerby, and indeed, she refused several of Agent Blackerby's requests during the interview without consequence. The interview lasted only twenty minutes, after which Blackerby thanked defendant for her time and advised her that she was free to rejoin her class.

Based on the foregoing, I find that a reasonable person would have understood that she was free to end the questioning and leave the interview area. Accordingly, it is my Report and Recommendation that Wright-Darrisaw's motion to suppress her March 3, 2012 statements to law enforcement be **denied**.

2. Motion to Suppress Information Seized from Cell Phone: Wright-Darrisaw also seeks to suppress information seized from her cellular telephone during the March 3, 2012 interview with law enforcement. There is no dispute that law enforcement did not have


9

a warrant to search defendant's cellular telephone that day. At the conclusion of the suppression hearing, the Court confirmed with defense counsel that the fact at issue was whether the information obtained from the defendant's cell phone was seized involuntarily by Agent Blackerby, or whether it was voluntarily displayed by the defendant to Agent Blackerby.

The Government has the burden of proving by a preponderance of the evidence that consent to conduct a search was freely and voluntarily given. United States v. Vasquez, 638 F.2d 507, 524 (2d Cir.1980); United States v. Isiofia, 370 F.3d 226, 231 (2d Cir. 2004). "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" Isiofia, 370 F.3d at 231 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995)(internal quotations and citations omitted). The Supreme Court has "long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." Florida v. Jimeno, 500 U.S. 248, 250-51 (1991). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"

Id. at 251.

Here, the evidence in the record establishes that defendant told Agent Blackerby that the White House's phone number was "in her cell phone contacts," took her cell phone out of her purse, "opened it up, pulled [the White House telephone number] up and turned [the phone] and showed it to" Blackerby. See 1/29/13 Tr. at pp. 12-13. Agent Blackerby looked at defendant's cell phone for only "[a] couple seconds," never took the cell phone from defendant and never touched the phone or "scrolled" through her call log. Id. at pp. 13, 29. When Agent Blackerby asked defendant about her cell phone's "call logs; the call history, incoming and outgoing calls in her phone" and, specifically, whether he could see the call logs on her phone, defendant responded "no," refused to show Blackerby her call logs or call history, shut her phone off and placed it back in her purse. Id. at pp. 14, 29. Agent Blackerby did not ask defendant to take the cell phone back out of her purse, or to show him the cell phone again or hand the cell phone over to law enforcement.

Based upon the totality of the circumstances, the Court finds that it was objectively reasonable for Agent Blackerby to believe that defendant had given him consent to view the information the defendant showed him on her cell phone that day. Wright-Darrisaw voluntarily displayed the information on her cell phone to Agent Blackerby, and Agent Blackerby briefly looked at the information on

11

her cell phone and confirmed that it contained a telephone number linked to his investigation - *i.e.*, the telephone number for the White House. Wright-Darrisaw was obviously aware of her right to refuse to consent to a search of her phone as she exercised that right when Agent Blackerby sought further information. In sum, the Court finds that the Government has met its burden of proving that the defendant's consent for Blackerby to view the information on her cell phone was voluntary. Accordingly, it is my Report and Recommendation that the defendant's motion to suppress the information taken from her cell phone on March 3, 2012 by law enforcement be **denied**.

## Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motions to (1) suppress statements made to law enforcement on March 3, 2012 (Docket # 28), and (2) suppress information seized from her cell phone on March 3, 2012 (Docket # 28) be **denied**.

**SO ORDERED.**

_____
JONATHAN W. FELDMAN
United States Magistrate Judge

Dated: May 2, 2013
Rochester, New York

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[1]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: May 2, 2013
Rochester, New York

---

[1] Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. United States v. Andress, 943 F.2d 622 (6th Cir. 1991); United States v. Long, 900 F.2d 1270 (8th Cir. 1990).